Arthur Wachtel, J.
The tenant prior to April 1, 1946 and since 1940 occupied unenclosed space in a public market as a retail butcher shop at a rental of $50 per month. On April 1, 1946 he entered into a lease with the then landlord Joanbar Corp. for “ one half of market as now laid out.” Thereafter a second lease was executed (landlord’s Exhibit 2), wherein Joanbar Corp. leased to the same tenant “ butcher store as now laid out and known as 4156-A White Plains Boad, Bronx, New York City,” for a term of three years and six months, to commence from the first day of October, 1950, and ending March 31, 1954, “to be used and occupied for retail butcher shop ” at a rental of $75 per month for the period ending March 31, 1951, and $100 a month for the balance of the term. The space occupied by the tenant was enclosed, subsequent to the entering into of the second lease, according to the landlord’s testimony.
The landlord brings this proceeding for nonpayment of rent for the months of July, August and September, 1956 on the basis of $100 a month, making a total of $300. The tenant disputes the alleged rent and contends that the said rent as prescribed in landlord’s Exhibit 2 is not the proper emergency rent for the said premises inasmuch as the said lease is governed by section 4 of the Business Bent Law (L. 1945, eh. 314, as amd.) and fails to include a statement provided by subdivision 3 of said section, more particularly paragraph (iii) of the said section, that the tenant within 60 days after the date of the execution of such agreement may cancel said agreement by notice to the landlord by registered mail enclosed in a securely sealed post-paid wrapper addressed to the other party at his last known address and requiring a return receipt. The tenant further contends that the emergency rent on the freeze date was $50 a month and that the landlord was entitled to 15% of that amount plus an additional 15%, or a total of $66.05 per month, and that accordingly the tenant is entitled to an overcharge of $33.95 a month for the period of one year, and interposes a counterclaim therefor. Inasmuch as there was no proof as to counsel fees, the claim therefor was dismissed by consent upon the trial.
The landlord contends that the second lease covering the period of October 1, 1950 to March 31, 1954 created a new tenancy and that the reasonable rent could be fixed by the landlord and tenant pursuant to subdivision (c) of section 2 of the Business Bent Law, which does not require a statement as to tenant’s option to cancel on 60 days’ notice, relying upon the authority of Waters v. Jacobs (200 Misc. 291) and Manuel Realty Corp. v. Blank (198 Misc. 393). However, *98 neither case cited by the landlord applies to the facts in this case. In the Waters case the court made a specific finding that the premises leased were not ‘ ‘ entirely ’ ’ occupied on the rent freeze date, but comprised of newly created business space, and embraced in addition, a second section occupied by another tenant, and a third unoccupied section. Based on such finding, the emergency rent could properly be fixed by agreement, pursuant to subdivision (c) of section 2 and accordingly the statement granting the tenant an option to cancel the lease on 60 days’ notice was not required. The court further went on to say (pp. 293-294): “Whereas, a situation where the premises were occupied on the rent freeze date and a rental in excess of the emergency rent is sought, falls within the provision of paragraph (iii) of subdivision 3 of section 4 of the act, which requires such a statement in the agreement.” (Citing 147 East 86th St. v. Yaeger, 190 Misc. 458.)
In the latter case (147 East 86th St. v. Yaeger), the Appellate Term of the First Department specifically stated at page 460:
“ Section 2 and section 4 relate to and govern separate and distinct matters; they are not interrelated at all. The provisions of section 4 are not applicable to and do not govern an agreement made under section 2.
“ Subdivision (c) of section 2 deals with and defines emergency rent and prescribes a method and procedure for fixing the emergency rent of premises vacant on June 1, 1944, the freeze date. It distinctly provides that as to such space the emergency rent is to be the reasonable rent therefor as business space on June 1, 1944, plus 15% to be determined on the basis of comparability or other satisfactory evidence. Section 2 thus fixes an emergency or ceiling rental of space vacant on the freeze date where no emergency rent previously existed.
“ Section 4 relates solely to and is concerned with the fixing of rent in excess of the emergency rent and, necessarily, presupposes the existence of an emergency or ceiling rent and sets forth the elements to be considered by arbitrator or court in fixing the rent in excess of the emergency rent, and it is apparent from a reading of section 4 that it has reference and relates to tenants already in possession for the purpose of fixing a rent in excess of the emergency rent and has no application to agreements fixing an emergency rent for space vacant on the freeze date, June 1, 1944. Section 4 deals with agreements as to tenants using or occupying the same space on March 28, 1945, the effective date of the act.”
In the Manuel Realty Corp. case (198 Misc. 393, supra), cited by the attorney for the landlord, the court found that the stair *99 way space was not used on June 1, 1944 for business purposes, and that the demised space was not part of a single unit which was used on said June 1, 1944 but was made up of parts of several units, and included a new unit as well, namely, the stairway space, and that by reason thereof, the space demised was ‘ ‘ entirely new, ’ ’ and ‘1 viewing same from an overall perspective, the original spaces, which some of the demised parts comprised, have lost their identity.” By reason of this finding of fact, the court held that the parties could fix the emergency rent pursuant to subdivision (c) of section 2.
However, in the case at bar, there is no addition to the original space occupied of space not theretofore used for business purposes, nor is this a case of establishing a new unit by addition of space not previously occupied. The identity of the previous tenancy is not destroyed by the second lease — rather it is more defined by enclosure. The tenant occupied under landlord’s Exhibit 1, space “ used and occupied only for retail butcher shop.” The landlord on his own testimony testified that the construction of the wall in question did not occur until after the execution of landlord’s Exhibit 2. Thus, at the time of the execution of lease Exhibit No. 2, the tenant occupied the same space and the lease referred to business space already occupied by the tenant; an emergency rent was in effect as of the time of the execution of landlord’s Exhibit 2, and the same lease, landlord’s Exhibit 2 purported to effect an increase in the said existing emergency rent. This could be done by agreement, only, however, pursuant to section 4, and accordingly requires the statement under paragraph (iii) of subdivision 3.
The landlord further contends, however, that even if section 4 were to be deemed controlling, the language in paragraph 27 of the lease substantially conforms to the required statement, and cites in support, the following opinion of Mr. Justice Peck in Roof Health Club v. Jamlee Hotel Corp. (271 App. Div. 481, 484): “ We readily agree with Special Term’s determination that the advice by the landlord to the tenant of its rights under the emergency rent law need not be contained in any writing separate and independent from the lease, and we also agree with Special Term that the notice contained in the lease here, while not in the exact words of the statute, was a substantial compliance with the requirement that plaintiff be notified of his right to continue to pay the emergency rent until modified in accordance with the statute.”
However, as appears from the decision of Mr. Justice Eder in the Supreme Court (64 N. Y. S. 2d 473) section 4 was deemed applicable in the Roof Health Club case, and the lease in that *100 case specifically contained the statement giving the tenant the option to cancel within 60 days after the execution of the lease as required by paragraph (iii) of subdivision b. The quotation of Judge Peck’s opinion relied on by the landlord refers to paragraph (ii) of subdivision 3, not paragraph (iii) of subdivision 3, and the point involved was whether paragraph (ii) of subdivision 3 which requires the statement that the landlord has advised the tenant prior to the making of the agreement of his right to continue payment of the emergency rent until modified by arbitration or by the Supreme Court had been complied with. But compliance with this requirement is not involved in the case at bar.
Counsel for the landlord further contends that the law does not contemplate judicial inquiry into the reasonableness of the rent fixed by voluntary agreement. This is true, provided, the requirements of subdivision 3 of section 4 are complied with, and the cases relied on by the landlord, Roof Health Club v. Jamlee Hotel Corp. (supra) and Bakst v. Diaz (200 Misc. 140) support this statement of the rule, rather than the statement of counsel. In the latter case, it was admitted that the requirements of paragraphs (i), (ii) and (iii) of subdivision 3 of section 4 were met, and the court specifically said (p. 142): “ Where the landlord and tenant agree between themselves, and the agreement contains requirements of paragraphs (i), (ii) and (iii) of subdivision 3 of section 4, above stated, the tenant is adequately protected and such agreement is binding and enforcible. The tenant, as I have already pointed out herein-above, had the protection, if he saw fit, of exercising his option under paragraph (iii) of subdivision 3 and cancelling the agreement. ’ ’ (See American Broadcasting-Paramount Theatres v. Empire State Bldg. Corp., 133 N. Y. S. 2d 503, 505-506.)
The petition alleges ‘ ‘ that the rent charged is not greater than the emergency rent fixed for such space ” and in addition states, “ or such greater rent therefor as may have been fixed pursuant to section 8554 of the Emergency Business Space- Rent Control Law as amended.” [Business Rent Law, § 4.] This court finds that the lease relied upon did not comply with paragraph (iii) of subdivision 3 of section 4, and accordingly, the petition must be dismissed.
The counterclaim of the tenant presupposes that $50 a month, the rental prior to April 1, 1946, is the proper basic emergency rent. The facts in this case in respect of the fixtures, title to which was transferred to the tenant, and the repairs shared equally by both parties, create a question as to whether such amount plus the successive 15% increase is necessarily deter- *101 initiative of the rent to be charged. Section 3 of the Business Rent Law (L. 1945, eh. 314 as arad.) provides that rent in excess of the emergency rent ‘1 shall be presumed to be unjust, unreasonable and oppressive.” But this presumption is rebut-table and requires determination of the appropriate rent by the Supreme Court (Joanette Juniors v. Princeway Realty Corp., 272 App. Div. 420) or by arbitration or agreement pursuant to section 4. (See 82-12 37th Ave. Corp. v. Maffei, 189 Misc. 319; Duke’s Restaurant Corp. v. Day, 90 N. Y. S. 2d 16.)
This court finds upon the facts that the July, 1956 rent has been paid, and that the August and September, 1956 rents have not been paid.
Accordingly, the petition is dismissed and counterclaim is dismissed without prejudice to renewal upon the determination of the emergency rent as hereinabove set forth.